[In Bank. — October 23, 1883.]

# EX PARTE CHRISTOPHER REIS ON HABEAS CORPUS.

Phonographic Reporters — Power of the Courts to Fix and Order Paid their Compensation. — The Superior Courts in the city and county of San Francisco have power to fix and order paid the compensation of phonographic reporters in criminal cases, and it is the duty of the treasurer of the city and county to pay the same upon the order of the court.

Application for habeas corpus.

The petitioner was treasurer of the city and county of San Francisco, and was adjudged guilty and imprisoned for contempt of court for a refusal to pay, upon the order of the Superior Court, the compensation of the phonographic reporter of one of the departments of the court for taking and transcribing the testimony in certain criminal cases.    The remaining facts are stated in the opinion.

*Wm. Craig,* and *Oliver P. Evans,* for Petitioner.

*Clunie & Knight,* contra.

McKinstry, J. — Immediately prior to the adoption of the Codes the law with respect to phonographic reporters of the courts in San Francisco was contained in the Act of March 13, 1866 (Stats. 1865–66, p. 232), and in the Act of March 28, 1868. (Stats. 1867–68, p. 425.)    The first act authorized the district judges of San Francisco to appoint short-hand reporters, and provided that, in criminal cases, the compensation of the reporter

"shall be fixed by the court, *and paid out of the treasury of the county — on the order of the court.*" The Act of 1868 provided for the appointment of a reporter by the county judge of San Francisco, and the payment of his compensation in like manner.

Sections 269–271 of the Code of Civil Procedure as they read originally — since amended in particulars which do not effect the question we are considering — authorized each district and county judge in the State to appoint a short-hand reporter, and provided that "in criminal cases, . . . . the compensation of the reporter must be fixed by the court, and paid out of the treasury of the county in which the case is tried, *upon the order of the court.*"

The statutes of 1866 and 1868, above referred to, were not " expressly continued in force" by the Code of Civil Procedure.

They were therefore "repealed and abrogated" (Code Civ. Proc. § 18), unless kept alive by section 19 of the Political Code.

That section reads: " Nothing in either of the four Codes affects any of the provisions of the following statutes, but such statutes are recognized as continuing in force, notwithstanding the provisions of the Codes, except so far as they have been repealed or affected by subsequent laws : —

" 1.    All acts incorporating or chartering municipal corporations, and acts amending or supplementing such acts.

" 2.    All acts consolidating cities and counties, and acts amending or supplementing such acts." . . . .

It is not necessary to decide whether the Acts of 1866 and 1868 were acts " affecting " or " amending or supplementing " the consolidation act or charter of the city and county of San Francisco.

If, by virtue of section 19 of the Political Code, the Acts of 1866 and 1868 were continued in force, the district judges and the county judge, in San Francisco, had power under those acts to appoint reporters, and to fix their compensation in criminal cases, to be paid by the treasurer " upon the order of the court."

If, on the other hand, the Acts of 1866 and 1868 were repealed by the Code of Civil Procedure, sections 269–271 of that Code conferred like powers upon the district judges and courts and county judge and court. In either case, just before the adoption of the present Constitution, the District Courts and County Court could legally employ the power of appointing

a short-hand reporter, fix his compensation in criminal cases, and order such compensation to be paid, and it was the duty of the treasurer to pay the same "upon the order of the court."

Section 11 of article 22 of the present Constitution reads:—

"All laws relative to the present judicial system of the State shall be applicable to the judicial system created by this Constitution until changed by legislation."

Of course the former "judicial system" was not made applicable to the judicial system, or series of courts, created by the Constitution of 1879, for the latter was substituted for the former. By "laws relative to the present judicial system" was intended laws passed to render the working of the system harmonious and effective, which would include the laws passed to secure the preservation of evidence, and the payment of compensation to the officers through whose agency it was preserved.

Either the Acts of 1866 and 1868 (if not repealed by the Code of Civil Procedure), or the sections of the Code of Civil Procedure relating to the same subject, were therefore made applicable to the judicial system created by the Constitution now in force; the powers previously conferred upon the district judges and courts and county judge and court, with respect to the appointment and compensation of reporters, were transferred to the superior judges and courts.

It follows, the Superior Courts in San Francisco have power to fix and order paid the compensation of the phonographic reporter in criminal cases, and the corresponding duty is imposed upon the treasurer to pay the same upon the order of the court.

The petitioner is remanded.

Sharpstein, J., and Ross, J., concurred.

Thornton, J., concurring. — Phonographic reporters were first appointed in this State as adjuncts to courts under the provisions of the Act of May 17, 1861. (See Stats. 1861, 497.) That act authorized the judges of each of the fourth, sixth, seventh, tenth, twelfth, and fifteenth judicial districts to appoint such an officer, and provided inter alia (see § 3), "that in criminal cases or capital offenses, when the testimony has been taken down by order of the court, the compensation of the reporter shall be fixed by the court, and paid out of the treasury of the

county in which the case is tried, in the same manner as the fees of trial jurors are paid in such cases." In 1862 the third section of this act was amended, but the provision as to the compensation of the reporters was not changed. (Stats. 1862, 253.) In the first section of the Act of 1861 as amended in 1864 (Stats. 1863–64, 524), this new feature appeared, that the reporters appointed were required before entering upon their duties to "take and subscribe the oath prescribed by law for attorneys and counselors at law, practicing in the courts in this State." It is not too much to say that this made such reporters officers of the court. They were to some extent under the order of the court, and subject to its control. They performed their duties under the eye of the court, and became like clerks and bailiffs, officers of the courts to which they were attached.

The Act of March 13, 1866, entitled "An act concerning District Court reporters," (see Stats. 1865–66, 232) was the next act on the subject. The third section of this act was amended by the Act of 18th of March, 1868 (Stats. 1867–68, 455). Each of these last named acts had the same provision (see the third section) in regard to the payment of the fees of the reporter in criminal cases in these words: "In criminal cases or capital offenses, when the testimony has been taken down by order of the court, the compensation of the reporter shall be fixed by the court, and paid out of the treasury of the county in which the case is tried, on the order of the court." A change will here be observed from the former acts referred to. The Act of 1866 related to the judges of the fourth, fifth, sixth, seventh, tenth, eleventh, twelfth, third, and fifteenth districts. By the Act of March 30, 1868, the provisions of the Act of 1866 were extended to the second judicial district with a *proviso* of no consequence touching this case. (Stats. 1867–68, 668.) The act was further extended by Act of 1870. (Stats. 1869–70, 330.) This was all the legislation on this subject-matter prior to the adoption of the Codes.

These acts and the proceedings under them had no reference to the act commonly called the consolidation act. They had no more connection with it than they had with the charters of the cities of Sacramento, Stockton, and San Jose. At the time

these acts were passed the city and county of San Francisco was embraced within the fourth, twelfth, and fifteenth judicial districts, the city of Sacramento was in the sixth, the city of Stockton was in the fifth, and the city of San Jose was in the third. Each of these counties had a board of supervisors, and in no one of them is any reference made to a board of supervisors, or auditor of any political division in the State.

These acts had nothing to do with the municipal government of counties or cities, or cities and counties, so as to be under the control of the governing bodies or officers of such political divisions. They were a part of the judicial machinery of the State, assistants of the judges in the discharge of their responsible functions, and furnishing reliable aid to counsel in the rendition of their professional services to litigants. They expedited the administration of justice, and afforded a means·by which the occurrences of a trial could be correctly preserved, for the use and advantage of court and counsel, and giving further assurance to every litigant that no matter of fact or point in his case would be omitted or overlooked. It was specially advantageous in criminal causes, a history of all the incidents of which being written while the events constituting it were occurring. It may be said that the facts were photographed as they appeared, and the negatives of phonographic characters were laid up for future use and reference. The achievements of the reporters under these acts constituted a most valuable part of the administration of justice, and have been, since the first act was enacted, extended so as to apply to nearly all the courts of the State.

Thus the legislation continued until the Codes were adopted in 1872, and went into operation on the first of January, 1873. The provisions in relation to phonographic reporters are found in the Code of Civil Procedure, sections 269, 270, 271, *et seq.* By section 269 as it originally passed, the power to appoint such reporter was vested in the judge of each judicial district and in each county judge. (2 Hittell's Codes and Stats. p. 944, note *a* to par. 10,269.) This section was amended in 1874, so as to give such appointing power to the judge of each court of record. The provisions as to compensation will be found in section 274. This section was amended in 1874, but

in both sections the language as to compensation is the same as in the Acts of 1866 and 1868 above quoted. This provision underwent a change in 1880, when by amendment it assumed this form: "In criminal cases, when the testimony has been taken down or subscribed upon the order of the court, the fees of the reporter shall be certified by the court, and paid out of the treasury of the county or city and county in which the case is tried upon the order of the court." (See Amendments to Codes of 1880, 55.)

We see nothing in this change which divests the court of power to fix the compensation of the reporter. The power to fix is implied by the power to certify. The greater power includes the less. The power to fix is a means by which the court reaches the result which it is called on to certify, viz., the amount of the fees or compensation.

These provisions of the Code of Civil Procedure, as to reporters, are found in title iv., part i. Part i. relates to courts of justice, and title iv. of this part to ministerial officers of courts of justice. (See "Summary of Contents" in Olney's 4th ed. Code Civ. Proc.) Chapter iii. of title iv. treats of Phonographic Reporters, as ministerial officers of courts of justice in California. In the view of the law-making power, these reporters were regarded as official adjuncts of the courts of justice, and we think the testimony of bench and bar would be universal that they are most valuable adjuncts. They are officers of the court and take an oath as such. (Code Civ. Proc. § 272.) The legislation on the subject shows that the laws relating to phonographic reporters pertain to the judicial system of the State, and are part and parcel of it, and so have been ever since their adoption, at least since the adoption of the Codes.

Reference is made to section 19 of the Political Code as bearing on this subject. In that section it is provided: "Nothing in either of the four Codes affects any of the provisions of the following statutes, but such statutes are recognized as continuing in force, notwithstanding the provisions of the Codes, except so far as they have been repealed or affected by subsequent laws:—

"1. All acts incorporating or chartering municipal corporations, and acts amending or supplementing such acts."

"2. All acts consolidating cities and counties, and acts amending or supplementing such acts."

That by these provisions, the consolidation act and the acts amending or supplementing it, were continued in force, except so far as they were repealed or affected by subsequent legislation, there can be no doubt. But the provisions of that act were not enlarged by this section. It recognized it as existing, unrepealed and unaffected by anything in the four Codes. It remained the same as it was before the passage of the Codes, giving jurisdiction to the officials of the municipality over the same subjects and the same demands upon the city and county treasury, which it conferred before the Codes became law, and no other. Those demands were defined in the acts referred to, but there was no demand among them relating to the compensation of phonographic reporters. Such a demand was never a part of the municipal business; although the laws relating to such reporters had been in existence before the adoption of the Codes, allowing their compensation to be fixed by the court and paid out of the county treasuries, by the order of the court, the boards of supervisors had nothing to do with such demands, or if they did have anything to do in passing on such demands, such action was supererogatory and extra jurisdictional. The order on the treasurer to pay the demand on the *allocatur* of the court was imperative and unqualified, and there can be no doubt that the treasurer was protected by law in making such payment. Section 95 of the consolidation act specifies the demands payable out of the city and county treasury (see Stats. 1856, pp. 172, 173), and we look in vain in it, at any period of its existence, for any provision authorizing the payment of compensation to phonographic reporters.

Section 97 of the same act restricts all demands payable out of the treasury of the city and county to those within the powers of the board of supervisors under the act, and section 98 expressly inhibits the payment, at any time, of any expenditure not authorized by the act. The powers of the board of supervisors are enumerated in section 74 of the act, and we cannot find at any period of the existence of this section, or in any phase which it has assumed, any power vested in such board in relation to the compensation of phonographic reporters.

That the demands referred to in the consolidation act are those mentioned in and authorized by it, is further clearly shown by the language used in section 82, to this effect: "No payment can be made from the treasury or out of the public funds of said city and county, *unless the same be specifically authorized by this act,* nor unless the demand which is paid be duly audited, as in this act provided, and that must appear on the face of it." (See art. vi. of Consolidation Act, on Finance and Revenue, and § 68 of same act.)

The provisions of the Code of Civil Procedure above referred to repeal nothing of the consolidation act. But it may be said, if it does not repeal, it affects that act. How, it would be difficult to point out. If the provisions of the consolidation act are left untouched, if its officers exercised the same powers and discharged the same functions under this act after as before the Code legislation alluded to, we cannot perceive that the act is affected. That the powers of the officers are changed or their duties interfered with, nowhere appears. It does not act upon, or produce an effect on, or change (see Webster's definition of "affect") any of the provisions of the consolidation act, and if it does not act on, or produce an effect on or change any of the provisions of that act, it can scarcely be held that such act is affected. The Code legislation may, and does, superadd a duty to an officer, the treasurer, which he was not called on to discharge before. It does this by an independent and distinct statute. But this does not affect any power or duty vested in him by the consolidation act. Those duties remain as they were, and another one is added. To say that this additional duty cannot be imposed on any officer of the corporation, is to deny to the legislature the power conferred on it by the paramount organic law.

Treating the four Codes as parts of the same statute (Pol. Code, § 4480), it becomes the duty of the judiciary in their interpretation, to reconcile all conflicts, if it can be done. And conceding that the above cited provisions of section 19 of the Political Code and the sections of the Code of Civil Procedure in regard to phonographic reporters seemingly conflict, they ought to be so construed as to make every word of each have its proper meaning and effect, and this can be easily done by

referring the provisions of the consolidation act to the objects for which it was intended, and the provisions of the Code of Civil Procedure to the objects for which it was enacted, in accordance with the rule of distributive construction expressed in the Latin maxim *reddendo singula singulis.*

It would be very strange if the compilers of the Codes had inserted a provision in the Code of Civil Procedure conflicting with a statute continued by the provisions of the Code, with a declaration that nothing in the Codes should affect this statute, and that the legislature should have enacted the Codes in the same shape.   Certainly, it never was in the contemplation of the framers of the Codes or of the legislature enacting them that anything in the Code of Civil Procedure in relation to phonographic reporters had any reference to any provision of the consolidation act or affected any of its provisions.

There are other declarations in the Code of Civil Procedure inserted as rules for its interpretation, which go to show that the provisions as to reporters were never intended to conflict with or affect, and did not conflict with or affect anything contained in the consolidation act.   Thus, section 4 of the Code of Civil Procedure declares: "The Code establishes the law of this State respecting the subjects to which it relates, and its provisions and all proceedings under it are to be liberally construed, with a view to effect its objects and to promote justice."

We know no other statute in the State in regard to phonographic reporters than the provisions of the Code of Civil Procedure, and those provisions under the rule laid down in section four above cited, *establish the law* on the subject to which it relates, viz., phonographic reporters.   Can it be said in the face of this clear and distinctive declaration, that the provisions of the Code of Civil Procedure on this matter are in any way superseded, affected, or changed by any other statute, even by the consolidation act?

Again, section 5 of the Code of Civil Procedure provides: "The provisions of this Code, so far as they are substantially the same as existing statutes, must be construed as continuations thereof, and not as new enactments."

This is in part a rule of construction, and as such its meaning is that words used in former statutes on the same subject have

LXIV. Cal.—16.

the same meaning in this Code as in the former statute, which statute is repealed, whether consistent with the provisions of the Code or not. (§ 18, Code Civ. Proc.)

It would in our judgment be a strained construction to hold that the Code of Civil Procedure did not establish the law of this State in regard to phonographic reporters, their compensation and mode and manner of payment.

Whether the consolidation act can be changed by general laws enacted by the legislature, is a question which does not arise in this case, as there is nothing in the act mentioned relating in any way to phonographic reporters.

But conceding that such question does arise, it is very easy of determination. The Constitution expressly declares that "cities or towns heretofore or hereafter organized, and all charters framed or adopted by authority of this Constitution, shall be subject to and controlled by general laws." (Const. § 6 of art. xi.) It would be difficult to use language more plainly and clearly declaring that all cities or towns, whenever organized, shall be subject to and controlled by general laws, and all charters thereof framed or adopted by virtue of the Constitution shall also be subject to and controlled by general laws. That this provision applies to the city and county of San Francisco is plainly declared in section 7 of the same article. This could hardly be otherwise under a Constitution in which the broad legislative power is vested in a legislature, without restriction on the power of enacting general laws. The restrictions on the legislative power extend only to special and local statutes. There are none in regard to its exercise of the power by general legislation. Now, to hold that a charter of a city or city and county is beyond the reach of general laws passed by the legislature would be to place the power of a part of the State over the power of the whole; to accord a greater power to a particular district, and that a very small district, than to the whole State. The order of things by such a ruling would be reversed, and a beneficial exercise of the central power would be neutralized by a local authority and the rights of the citizens of the State out of such locality would be affected by a legislation entirely beyond their control even when acting with all the representatives of the other portions of the State, convened as a legislature

in Senate and Assembly. The evils of local and special laws are not found in general legislation. General laws are enacted by all the representatives of the people. Each representative knows when he casts his vote that such a law will act upon his constituents and himself, and may affect their and his interests. Such is not the case with local and special laws. They only affect a district or class, and the majority of the legislature frequently impose such laws on a minority with a reckless disregard of right, because such laws do not operate upon their constituents nor themselves. Their constituents and themselves are safe from the consequences of such unrighteous laws, and careless of the rights of others who are a powerless minority in the spirit of *apres nous le deluge* the majority enacts laws, oppressive of such feeble minority.

This law concerning reporters is a general law. The compensation of the reporters is fixed by a judge, elected in the city and county by the same constituents who elect the board of supervisors, and the other officers of the city and county, and all are responsible for misconduct in office to the same constituency. Thus the local influence is as much felt by the judge as by the officials of the city and county, and every guarantee for a faithful and honest discharge of official duty is had in the case of the judicial incumbent as of the board of supervisors. The danger of lack of local influence and local responsibility is no less in the case of the judge than of the officers of the municipality.

There is another consideration which is entitled to be regarded in the discussion of this subject. The law in relation to phonographic reporters appertained to the judicial system of the State, and constituted a part of it. Such laws were kept in existence by the eleventh section of article 12 of the Constitution, until changed by legislation. It would be strange if the administration of such a law were committed to boards of supervisors or other officers of a municipality. Some degree of discretion is left to the official administering this law. The compensation must be fixed by the court, or the fees certified by the court. (§ 274, Code Civ. Proc.) Such duty appertains to the court. Would it not be peculiarly strange if a board of supervisors was to be required to supervise the action of a

court under a form of government where the judicial, executive, and legislative functions are distinctly separated by the organic law? We think this would be an anomaly in legislation which does not appear in our statutes. That a board of supervisors should review and reverse or modify the action of a court of general jurisdiction would be a thing unheard of in our system. If the board under the city charter can act on such claim it can disallow it, or it can allow in part. (§§ 83, 85, 92, Consol. Act.) It may cut down the compensation so that no competent reporter can be found to undertake the work. Thus the administration of the law in criminal cases would be embarrassed and impeded. An unseemly and unfortunate conflict between two departments of the government may thus be brought about, which should by all means be avoided. It is no answer to this to say that it is highly improbable that such a conflict will ever occur. Stranger things have happened. It might occur, and an interpretation of the law which might allow it should not be made.

What is said above applies to any presentation made to the auditor for his action. Such action is not required.

The legislation of this kind is not new. Witnesses in criminal cases were required to be paid by a provision of the Penal Code out of the county treasury by the county treasurer upon the order of the county judge. The production of the order or a certified copy of it was alone required to make it the duty of the treasurer to pay it. (§ 1329, Pen. Code.) Such was section 1329 as it was originally framed. It was afterwards modified by amendment in 1876. By this change the court in one case, and the judge of the court in all others, were empowered by written order to direct the auditor to draw his warrant on the treasurer, "in favor of witnesses for a reasonable sum to be specified in the order, for the necessary expenses of the witness." No intervention of the board of supervisors is required here, nor does it affect the consolidation act for the reasons above set forth. The legislature fixes the mode of audit and payment in this as in all other cases, out of county or city, or city and county treasuries, within the constitutional limits, and the law is valid.

See also the power given to the judges of the courts to create

a charge on the county or city and county treasuries by section 144 of the Code of Civil Procedure, where suitable rooms for holding courts and the chambers of judges thereof are not provided in any city and county, or county, by the supervisors thereof. Here a charge is created against the treasuries of the political divisions mentioned in opposition to the action of the board of supervisors.

It will be observed that the provision as to payment of compensation to the reporters in criminal cases in the first act passed on the subject (Stats. 1861, p. 498), was that the compensation should be fixed by the court and paid out of the treasury in the same manner as the fees of trial jurors are paid in such cases. The statute as to the payment of trial jurors may be seen in Parker's Supplement to General Laws of California, par. 8,084, p. 160. This payment was to be made on the certificate of the clerk of the court, out of the county treasury or other county dues. If this should be held to require the action of the board of supervisors or of the auditor, then the change made by the Acts of 1866 and 1868 becomes very significant, and plainly indicate that no action of board or auditor is required.

I am of opinion that the order of the Superior Court is within its jurisdiction, the application should be dismissed, and the petitioner remanded to the custody of the sheriff of the city and county of San Francisco.

McKee, J., dissented.